Good morning, Mr. Rose. I see you reserved two minutes for rebuttal, and you can begin whenever you're ready. Yes, Your Honor. Thank you. May it please the Court, Jonathan Rose for Dependent Appellants, Cross Appellees. We seek reversal of the District Court's decision and respectfully request entry of judgment for appellants on three separate and independent bases. First, the undisputed record shows adequate notice under 29 U.S.C. 1022 of ERISA was provided to Ms. Hamill, and to the extent there was any deficiency with that record, the defendant is found guilty of finding second circuit precedent. Second? Okay. So can we figure out, like, so there's two issues. Let's deal with them both. Would you at least concede that the language suggesting potential liability at least muddied the notice? Would you concede that at all? Your Honor, we would I mean, I'm just thinking that if I received a letter like that, I would at least want to sit and think about what somebody would then down the line argue that I was agreeing to if I responded. Right? So I'd have to at least think about, you know, was I waiving anything? Would somebody argue that I was waiving anything? Is the line muddied at all? We would submit no, Your Honor. There was a cover letter. There's no requirement for a cover letter to be sent with the election forms. The election forms, it is irrefutable, were very, very straightforward. And she had multiple counsel to So you would say that it wasn't, it wasn't obfuscated at all? We would suggest under Weinberg, to the extent there was any deficiency or confusion with respect to that cover letter, that there was absolutely no question with respect to the election forms, and the irrefutable record showed that Ms. Hamill and her counsel understood it. And there was absolutely no question. And to your initial point, Your Honor, to the extent someone sits back and has any confusion, the forms actually said, you may want to get counsel, you may want to see counsel, and she got multiple counsel. But the law is, Mr. Rose, the law is that just because the form is accurate, that there's nothing incorrect in the form, that's one way of having liability. But we've said over and over again, including just in 2024 in the Peston case, which was cited by the district court and by your adversary, that you breach the duty of the district court when you fail to provide information about the plan, when you know that the failure to do so might cause harm, and that you have to describe the advantages and disadvantages of the plan. That's the law. Do you agree that's the law? No, Your Honor. I just read you. It's from one of our cases. So how can you disagree that that's the law? Well, Your Honor, what I would say is that Do you want to read it again? When a plan administrator affirmatively misrepresents the terms of the plan, let's say we don't have that, or fails to provide information when it knows that it's fair to do so might cause harm, the plan administrator has breached its fiduciary duty. Your Honor, with respect to your question, the cover letter was a cover My question was, is that the law or not? You said, no, it's not the law. What I'm suggesting is that this situation is different. There was a portion of the cover letter that related to Ms. Hamels and Marcia Hebel's role as a former fiduciary. The notice requirements under 1022 relate to notice of plan elections. There is no question But these were arguments that you made before the trier of fact, heard evidence firsthand, heard the testimony of relevant parties, and determined that the letter was confusing and did not provide adequate notice and breached that fiduciary duty. What are we to do with that? How is that wrong? That's what the find You went to trial on that. It was a bench trial. And the court made those findings. What are we to do with that? Yes, Your Honor. With respect to that, we would submit that the district court misapplied the law as the standard of the sufficiency of the notice. The notice was the same to all participants. It expressly stated, just check a line, which election If there's a significant outcome, choosing one option versus the other, where if you don't elect the lump sum before Marcia dies, your benefits are going to be reduced drastically. We agree that that's what happened to you, right? Well, Your Honor, with respect But by not electing the lump sum, there was a drastic reduction of benefits. Your Honor, there is absolutely no responsibility of fiduciaries of plans that chase down participants. In fact, specifically But I think what Judge Bianco is getting at is whether or not you can say that it was harmless, right? I mean, doesn't that by itself establish that it wasn't harmless? And now what you have to do is convince us that the district court was so wrong in finding the fact that it was confusing. And that's what we're giving you the opportunity to do.  Thank you, Your Honor. With respect to the sufficiency of the notice, a high school graduate, just a small plan, three participants, a high school graduate who was able to review the form without multiple counsel and was Where in the form would it have indicated that there was going to be a substantial reduction of benefits if he didn't opt the lump sum plan before Marcia passed away, before the termination? Where did it say that in the form? Where did it say that in the letter? Where did it say that anywhere? Your Honor, that is simply inherent in plans. There is no right to a posthumous election. They knowingly waited five months with substantial correspondence to the DOL. My friend, Ms. Berkowitz, wrote a FOIA request to the PBGC. Would you agree that it's inconceivable, this was the district court's line, it's inconceivable that if someone understood the options and what the ramifications of the options were, that they would have done what was chosen here? Would you agree with that? There's no ramification of the options. There's no rational economic reason, none in the world, that someone would have picked this option. Your Honor, I would agree with that. And I would say that they So it's not harmless. I know you're saying the notice was fine, but assuming the notice wasn't fine, it certainly wasn't harmless because obviously they would have picked the option that would have got them a million dollars more. Your Honor, the reason that I say that it's harmless is because there was actual knowledge, an election needed to be made, and she knowingly did not make it. Don't you see the difference between actual knowledge that an election needs to be made and actual knowledge of what the advantages and disadvantages and ramifications of the election are? There's a big difference. That's why the notice suggested getting counsel. She had three, including one of the The law isn't that you could just put in get counsel and not disclose a significant ramification in a plan. That's not the law. If you put in, by the way, you should get counsel, that you're absolved. That's not our law. That is not what I'm saying, Your Honor. What I'm saying is she did get counsel, and their knowledge is imputed to her, and they testified. Their irrefutable record is that she can't shift her fiduciary duty or client onto counsel, onto the appellee's counsel. There is no fiduciary duty to advise participants on which election to select. And didn't the trial court also consider the fact that, with respect to the foreman, there was a lot of follow-up communication? Hey, it's in your interest to elect this lump sum. And, in fact, he didn't. He didn't elect until after Ms. Marsha Hebel had died. That's not actually in the record. What it is, there was some follow-up with him to fill out the forms. However, he was unsophisticated. He apparently needed to open up an account with a brokerage firm. There was some delay in there. But with respect to follow-up, there was substantial follow-up with respect to Ms. Hemel. And, in fact, it was impermissible for them to reach out to Ms. Hemel directly because she was represented by counsel. Multiple counsel, including an ERISA specialist, one of the finest practices in the country. She had actual knowledge that an election would be made. Some evidence of that was letters seeking information with respect to an annuity. Their position is everyone knows she would have selected a lump sum. She's an 87-year-old woman in a firm during the period. They were a little confused because they had received a letter saying that she owed $1.5 million. They were a little confused, as Judge Petra has pointed out, about they didn't want to take any drastic action. We have to look into this annuity. We've got to figure out what they're talking about. And to that point, Your Honor, she's said they had actual knowledge. They clearly didn't have actual knowledge. They had actual knowledge that there was an option. They didn't have actual knowledge of the advantages and disadvantages of each option. They were looking into that. She sought counsel for that. That's not a fiduciary's responsibility. In fact, that would only increase their responsibility. And counsel was trying to get information to make those assessments, but was not receiving answers. That's actually not the case, Your Honor. The information that they were seeking with respect to annuity providers is not required under ERISA, and for good reason, because no annuity provider, no insurer is going to give a quote if they don't know how many participants and their demographics. It's not a requirement. But they were seeking it. They went five months knowing an election needed to be made, knowing they had a woman who was 87 infirmed during COVID in a nursing home, and they knowingly, with knowledge of the election forms, knowledge that there was no question it was received, there's nothing overlooked, they were seeking information that wasn't required under ERISA and is virtually impossible to provide. She had multiple counsel. Their knowledge is imputed to her. I think we get the argument. These are two minutes worth.  Ms. Berkowitz. Good morning, Your Honors. Dana Berkowitz for Plaintiff Appellee Elizabeth Hamel in her capacity as the Executrix of the Estate of Marsha Hebel. Consistent with the practice below, with the Court's permission, I'll go ahead and refer to the family members by their first names. My friend on the other side has made a couple of points that I'd like to respond to. First, to Judge Bianco's question about the drastic reduction of benefits that would happen if no election was made. Obviously, that information was never provided. I do want to point the Court to a portion of the record in which such notice was provided. It's at JA 1426. It's a letter from Attorney Black to me in January of 2021 after Ms. Hebel had died, after Marsha had died. He wrote to me, As I'm sure you know, a qualified defined benefit plan can give participants the choice to take either a lump sum or annuity payment on plan termination, but it is an either-or situation. If lump sums are not elected in writing, a plan is legally required to make annuity payments. And then he goes on, after Ms. Hebel died, she permanently lost their right to get paid in lump sum form. She was paid the default annuity amount under the applicable statutes and regulations. That's clear. They knew how to do it. They just didn't. Okay, so can I ask, though, your whole case seems to rely on the notion that the election forms themselves were not enough. Is that right? I don't think so, Your Honor. It's my point. So the forms have to be considered in the context in which they were sent. That's the standard for SPDs. We don't look at a specific piece of an SPD. We look at the SPD as a whole. Defendants concede in their brief that that's the standard that applies here. So we have to look at that cover letter. And they're absolutely right. They didn't have a duty to write a cover letter. But once they chose to write a cover letter, they had a duty to make sure that that letter was not materially misleading. Okay, but when the response indicated that she knew about the lump sum option in that letter, does that demonstrate that the information was at least effectively conveyed? I don't think so. That letter from Mr. Bliss to Mr. Black from November 5, 2019, I'm sorry, from December 6, 2019, is in the record at JA-1507. And if you look at the beginning of the letter in the very first paragraph, he says, I don't understand the basis for your demand that my client take less than her full benefit. We demand that she receive her full benefit. So our view is that what Mr. Bliss understood and what was conveyed was that there was an option for my client to elect $367,799 worth of benefits, which is, of course, the full value of the lump sum, minus the $1.5 million that they would have to pay as the minimum amount for the plan to terminate. That's what they were told. The plan couldn't terminate unless $1.5 million came from them. And only if a successful standard termination happened would they then get the lump sum. I'm trying to understand how much you're relying on the $1.5 million paragraph in that letter. If the letter had just said, Dear Mr. Bliss, it didn't have the first three paragraphs. It just said, I have attached the statement of rights and alternatives in election form to Marsha Hebbel and the beneficiary for you and your client's review and make a determination in that regard. The only sentence in the letter attaches the form. Problematic or not problematic? So I think that would be a much more interesting case, Your Honor. I think that ERISA is not a set-it-and-forget-it regime. It's something more than that. It's a fiduciary regime. So what your cases have consistently held and what Pessin recently held is that if you have material facts and your knowledge about the circumstances of a plan participant. So what material facts that you think might be missing? I'm actually surprised to hear your answer. I thought you were going to say that that was enough. Okay, it's not. What material facts are missing then with the amended letter that Judge Bianca is posing to you? Many of them are the facts that my friend on the other side just let you know. This is an 87-year-old plan participant. She's in a nursing home. It's COVID. There was undisputed. You think there's an obligation under the law to provide something about the ramifications of a drastic reduction in benefits beyond the form? I think if you have unique knowledge about the circumstances of a plan participant, which happens sometimes in the law. It happened in a state beat backer. It does happen. Wait a minute, but your client didn't know their own circumstances? So our client didn't know about the unconditional opportunity to elect a lump sum. On the other hand, their client knew everything. They knew about the lump sum option. They knew it would go away if she died without electing. But you just said that the facts that would have been helpful would have been things like she was 87, the fact that she was in a nursing home. Those are things that your client was unaware of? No, those are facts that gave rise to a duty in this case to follow up. Everybody testified that everybody knew that anyone fully informed would take the lump sum option. So is your argument that because her daughter understood or plan administrator her mother's situation, she had a duty to, in the cover letter, be clearer. I thought your argument was one of material misstatement, not material omission. Me too. Or maybe it's both. And I thought your argument was that you say, hey, the amounts of the lump sum are $899,000 and $12 to Herbert Hebel and $968,787 to Marcia Hebel as of October 15, 2019. Approximately one and a half million needs to come from your clients. The exact amount will depend on the date of the final distributions are made. Upon termination of the plan, the plan will distribute these additional contributions back to your clients. So I thought your argument was by conditioning this information about a lump sum election to a payment, advance payment of one and a half, that that was a material omission, a misstatement, which caused the harm here and breached the fiduciary duty. Did I misunderstand your argument? Absolutely, Your Honor. That is my argument. And that is what the district court found. My point is only – Okay. that the district court found, would that have been enough? So I'm saying you don't obviously need to decide that here. But if you are thinking about what does ERISA require, it requires the type of follow-up that they did with Richard Berwind, who, by the way, did not execute those documents until two months after Marcia Hebel passed. So extensive follow-up was required here because these are unsophisticated participants. You've got an 87-year-old woman in the hospital. You've got a foreman of a factory. And they kept reminding him he had to elect the lump sum payment or he would lose money. How important this was. They did. They followed up repeatedly. And that's not unusual for plan – Mr. Moore suggested they weren't allowed to contact her. I thought I heard him say that. What's your response to that? By law, they weren't allowed to contact her. That's kind of a bizarre assertion, I think, in this case. Of course, a plan fiduciary, I think, is legally required to provide notices here. This was, of course, not really a fiduciary communication. This came from lawyers who represented Pilot and Carolyn in her personal capacity. And it was intended, you know, on the best-case scenario for defendants, it was intended to initiate settlement conversations. It was adversarial. So I don't think there's anything that would have prevented them from sending full and complete and accurate disclosures from the fiduciaries of the Pilot plan to Marcia Hebel at the address that they had on file for her. But they could have sent it in care of to the lawyer. Of course they could have sent it. It would be then a communication with a representative party if it was sent to the person through the lawyer. There's nothing that would have prevented them from providing the information that Mr. Black provided to me in 2004. Aren't they claiming that they gave her notice of the election in a letter that went to Mr. Bliss, Attorney Bliss? Yes. That is, the notice they rely on is adequate notice went to counsel, correct? Yes, Your Honor. Can I just ask you a question on your cross-appeal on the breach of the duty of loyalty? I understand your argument about some of the findings the district court made about motivation and addictiveness. But on the core issue, because it seems to me on that claim you're focusing on the monthly payments and the excess funds at the end. Those are the two things, right?  Yes, Your Honor. What they argued in their brief, and I was trying to find how either of those things were a violation of the plan itself. Because even if she was vindictive, you obviously would have to have it be a violation of the plan or the law. And I didn't really see that. You cited, I think, correct, you cited a lawyer's explanation of what the law is. But where in the plan or the law does it say that a weight payment like that is problematic or what to do with those excess funds? It seems pretty murky what you do with excess funds in that situation. Sure. So two things I would say about that. So first, the same predicate offense that was confusing as to notice was also clearly here a breach of the duty of loyalty. But if that's all it was, there's no additional damages for that, right? Right. And that's why the district court, in my view, didn't reach the loyalty question. But as to the other two, so the first, on the money that she sent, that Carolyn, instead of paying to her mother on December 31st, she sent it to the trust account of her own attorney where it stayed for eight days, and then it was returned to the plan. Carolyn tested, and it wasn't paid to Marsha Hebel until four months after her passing. The testimony from Carolyn was that I knew that plan benefits had to be paid every year. They were paid every year by December 31st. And the only reason they weren't here was to gain. Was that in the plan, that requirement to pay by December 31st? Where did that come from? Was that in the plan? Or where was that? So there is, as far as we can tell, no requirement written in the plan. That was a custom of the plan. That was the custom that they paid benefits every year by the 31st. The reason she didn't hear was that she was in a dispute against her mother, and she wanted to gain an advantage in that dispute. And that was the testimony. So our submission on that front is. . . That she breached the custom? She breached her duty of loyalty. There was the only reason that she had that she failed to pay that fund in a timely fashion when she always did before to her mother was that she was mad at her and was hoping that she would pay $1.5 million to help terminate the plan. That's disloyal. What about the excess funds at the end? So the excess funds is a more interesting question. So they find funds after the plan has fully terminated. And now they have a problem because they don't know what to do with them. And the plan, if you look at Section 13.03 of the plan, which describes what happens upon termination, it suggests that all of these funds are supposed to be distributed in a nondiscriminatory manner. And it specifically says that any excess funds do not revert to the plan sponsor, Cure Pilot, which was fully controlled by Carolyn Hebel. So they didn't know what to do in a situation where they feared unreasonably that there might be tax consequences. And so their actuary tells them what to do. Hey, this can't be in a reversion. You have to contact the PPTC and IRS and seek advice. And Ms. Buckman, the ERISA expert they hire, says the last thing we want to do is give the IRS any reason to look at this further. We can't invite more scrutiny. She comes up with a theory and distributes the money entirely to Carolyn. That, again, was disloyal. That was disloyal. So if the damage is on it, then she's going to get awarded all that money, even though it's not clear under the law whether she was entitled to it to begin with? So we requested at page 63 of our brief, we requested remand on the issue of what the remedy is. We sought at trial her equitable share, pro rata equitable share in those additional plan assets that were found. We think that that's the most sensible determination. But I think the court erred fundamentally by finding that this was not disloyal, concealing these extra funds that had to be distributed in a certain way pursuant to the plan document, deciding not to seek impartial advice because they didn't want to invite further scrutiny of a problematic transaction. All right. Thank you. Thank you. Thank you, Your Honor. With respect to the duty of loyalty, with respect to the background family feud issues, there's one really important point to make here. There was absolutely no obligation for my client to provide a lump sum option at all. Could have terminated the plan with the annuity that was in place that it cost her $1.2 million to top off the plan. And the reason she was asking for 1.5 at that time was based on legal advice that this would be the potential result, that her mother's benefit would be cut back to the guaranteed max if she did a distressed termination. And she was trying to sell a property at the time that was not selling. She wanted to achieve the ---- The court found that the claim that she didn't do it because she was trying to sell a property was not supported by the evidence and did not credit that. How did the court err on that factual finding? Well, that's not essential with respect to the notice issue. What is important, Your Honor, is that it is unquestionable ---- No, but you're saying the only reason she didn't terminate earlier and put up the funds that were missing because the plan had been underfunded allegedly after she took over. I know there's a dispute as to when that underfunding began. But the court didn't credit that excuse for not properly funding the plan when she was told it was underfunded and was not allowed to terminate it because of that underfunding. She was unable to because the business was in decline, and that's not uncommon with companies that are in decline. They're not able to meet their minimum funding contributions. But with respect to the request, I'm just saying that it would have cost the client much less, my client much less, if she simply had terminated it without offering the lump sums which were not in the plan. Okay. I guess I just don't understand why that argument isn't beside the point. Isn't there a difference between what ERISA requires on a statutory basis and what a fiduciary must do in order to fulfill their duties? Well, there's plan sponsor and fiduciary functions, but I just want to loop back to Weinripp. Unlike Weinripp, Ms. Weinripp had no counsel. When Ms. Weinripp received nothing, the statutorily required SBD wasn't even provided in that case, and this Court found that there was harmless error because it was known that a selection had to be made. Unquestionably, Ms. Hamel, with her three sets of attorneys and her own testimony, irrefutable testimony, is she knew she had received it, she knew she had to make an election, and they waited over five months in extensive correspondence asking for annuity information that's not required under ERISA and directly conflicts with their claim. Everybody knew she was going to take a lump sum. If she had simply checked the box and signed them, she would have received a lump sum. All right. I'm going to ask you about the duty of loyalty on the excess funds. If it says in the plan the sponsor is not supposed to keep the funds, why isn't that problematic? If your duty of loyalty would be to look into it and find out what to do with the money, why wasn't a breach of that for the accountant to say, you know what, I'm just going to keep it for myself? That's not what happened, Your Honor. What it is is that there was an account that was found that was tied to the plan that was just not known. The plan had already been terminated. Marcia Hebel had already passed away. And there is complex rules under Section 415 and 417 of ERISA with respect to topping out contributions. And the actuary for the plan, the lawyer for the plan, the lawyer for PBGC, and the actuary for PBGC confirmed that that excess amount went back to the plan sponsor because the plan had terminated. I think there's evidence in the record that they discussed reaching out to the IRS or the PGRC, and that's the last thing we want to do is reach out to them. That wasn't in the record? There was some reference to that, Your Honor, and I would submit that that's irrelevant. It was simply a lawyer's statement. Why is that relevant on a breach of loyalty where you're supposed to be looking out for the interests of the plan? That does not relate to the breach of loyalty, Your Honor, because every single dollar of accrued benefits that Marcia Hebel was entitled to was received. The only reason she didn't receive a lump sum is she knowingly delayed making a decision as to her election seeking information with respect to an annuity provider, information that's not even required, and it completely contradicts their position that everybody knew she would take a lump sum. All right. Thank you both. We'll reserve the position. Appreciate it. Thank you. Thank you very much.